LOUISE GAECKLER, RESPONDENT, v. THE STATE SOCIAL SECURITY COMMISSION OF MISSOURI, APPELLANT.—155 S. W. (2d) 544.

Kansas City Court of Appeals.   November 3, 1941.

*Melvin J. Duvall* for respondent.

*Roy McKittrick* and *B. Richards Creech* for appellant.

SHAIN, P. J.—In this case we are called upon to review the judgment of the Circuit Court of Buchanan County, Missouri, reversing the award of the Social Security Commission of Missouri in denying the application of Louise Gaeckler for old age pension.

The record discloses that some twelve years prior to the application for this pension the applicant, in broken health and penniless except as to an insurance policy of a face value of $1,000, came to the home of A. O. and Louise Kellermeyer and was taken in by them and has remained in said home and has been cared for to the best of their ability ever since. Mrs. Louise Kellermeyer is the daughter of the applicant.

The story told by the record in this case presents a pathetic story of privation and misfortunes of a kindly son-in-law and a dutiful

daughter trying to keep the wolf from the door and doing their duty as best the could to an aged and indigent parent.

The petitioner, now over seventy-two years of age, had taken out a policy in the Modern Woodmen and named as the beneficiary her daughter Laura and other children. Not having the means to pay the assessments, the same were paid by her son-in-law.

The cash value of the insurance policy is testified to as $570. The award of the commission is shown as follows:

" (1) That the claimant owns or possesses cash or negotiable security in the sum of $500.00 or more; (2) that claimant has income, *resources*, support and maintenance to provide a reasonable subsistence compatible with decency and health and is not found to be in need. Therefore, claimant does not come within the purview of the statute and application for old age assistance is denied." (Italics theirs.)

The judgment of the circuit court is shown as follows:

. "Come now the parties hereto, by their respective attorneys and this cause is taken up and submitted to the Court upon the appeal from the decision of the State Social Security Commission and the transcript of the evidence given at the hearing before said commission, and this court being fully advised in the premises finds that the decision of the Commission is arbitrary and unreasonable, and this Court remands the proceedings to the State Social Security Commission for redetermination of the issues by the said State Social Security Commission.

IT IS THEREFORE ordered by the Court that this cause be, and it is hereby remanded to the State Social Security Commission for re-determination of the issues."

From the judgment of the circuit court the State Social Security Commission appeals.

Assignments of error appear as follows:

"I.

"The court erred in holding respondent entitled to old age assistance benefits when the evidence clearly showed that respondent is not in need.

"II.

"The court erred in holding for respondent for the reason that she has sufficient income or other resources to provide her a reasonable sustenance compatible with decency and health. .

"III.

"There is substantial evidence to support the award or decision of the State Social Security Commission. Therefore, this court should affirm the award or decision of the Commission."

Citations of authorities as to above are duly shown.

OPINION

The review of this case involves the construction of Section 9411, Revised Statutes, Missouri, 1939, and subsection (2), (3), and (6) of

Section 9406, Revised Statutes, Missouri, 1939. Subsection (6) and Section 9411, Amendments of 1937-39, materially change the law as interpreted by the courts of this State prior to the amendments. There are several cases reported since the amendments which construe the provisions of Section 9506 and Section 9411 as amended.

The Supreme Court of Missouri's decision in Howlett v. Social Security Commission, 149 S. W. (2d) 806, well defines the scope of a review of Social Security cases by appellate courts. The question as to whether or not the circuit court has kept within the scope defined in the opinion, *supra*, is pertinent to the review herein.

As to subsections (2) and (3), this court in the opinion in Miller v. Social Security Commission, 1515 S. W. (2d) 457, held as follows:

"That a life insurance policy, having a cash surrender value of more than $500.00 was not 'cash or negotiable security' within meaning of statute making the owner of 'cash or negotiable security' in the sum of $500.00 or more ineligible for social security benefits."

And further:

"That a life insurance policy held by applicant for benefits under State Social Security Act was 'property' within statute making owner or possessor of property of any kind in excess of $1,500, ineligible for such benefits."

As the appellant's brief confines itself solely to the construction of subsection (6) of Section 9406 and Section 9411, Revised Statutes, Missouri, 1939, we take it for granted that appellant raises no question as to the construction as to subsections (2) and (3), *supra*.

This court in the review of Dunnavant v. Social Security Commission, 150 S. W. (2d) 103, had the same legal questions before it that are involved in this case. In our construction of subsection (6), *supra,* as applied to the facts disclosed in the Dunnavant case, we reversed the action of the circuit court in reversing the award of the commission which denied relief to the applicant therein.

The question as to whether or not our conclusions therein reached, based upon the facts shown in the Dunnavant case, apply to the facts as shown in the case at bar, is pertinent to our review herein.

A review of the facts disclosed by the evidence in the case at bar are necessary to a solution. There were only four witnesses who testified at the hearing before the commission, all on behalf of the claimant. The testimony of these witnesses stands undisputed.

The applicant, approximately seventy-two years old, sick and feeble, testified in her own behalf. The testimony of applicant shows that she has not a clear understanding of business matters other than that she is penniless and in frequent need of medical attention, and that outstanding bills for such attention are delinquent.

The following question and answer is characteristic:

"Q. And during that time, has your daughter and son-in-law taken

care of you and supported you? A. To their best ability, I expect, Yes, Sir.''

The applicant was asked concerning an insurance policy. However, her understanding as to same appears limited. The insurance policy is shown to be a $1000 life policy in the Woodmen's circle. Mrs. Henze, agent and collector of premiums for the association was called as a witness and her testimony is to the effect that applicant's daughter had paid the premiums for the last ten or twelve years. Further, that premiums were approximately $40 per year and that the surrender value is a little over $500.

In the testimony of Mrs. Henze, the following questions and answers appear:

''Q. Do you know of your own knowledge why the daughter started paying the premiums? A. Mrs. Gaeckler was sick and she had no income and somebody had to pay it or it would be dropped.

''Q. Was the policy assigned or not? A. Before that it was made to all the children but after this one daughter had to pay it, of course, the beneficiary was made as her. She was made beneficiary.''

Louise Kellermeyer, the daughter with whom applicant lives, was called as a witness and testified as to general conditions in the home and as to the care she and her husband had managed to give applicant.

The following questions and answers in the daughter's testimony are pertinent:

''Q. You say you and your husband have been paying the doctor bills. What bills have you paid? A. Her medicine bill is very expensive. We tried to get a letter from the doctor but he is out of town. She is a little better than she has been. Her drug store bill is very expensive.

''Q. How much is it? A. Sometimes $10.00 a month.

''Q. What about the doctor bill? A. We don't have him any more than we have to have. She really needs more attention than she gets.''

And further:

''Q. Are you and your husband able to support your mother any longer? A. No.

''Q. Do you feel willing and able to continue to support her? A. No.

''Mr. Graves: I object to that.

''Mr. Crowe: Yes. I think that is immaterial.

''Mr. Duvall: Q. You refuse, do you, you and your husband, to support her? A. Yes.

''Q. That is all.''

The daughter's husband, A. O. Kellermeyer, was called as a witness. As throwing light upon the insurance and general expenditures, the

following questions and answers in Mr. Kellermeyer's testimony are pertinent:

"Q. Tell us why that arrangement was made? A. When she first came to live with us she had the beneficiary made out to all the children. We attempted to make arrangements for each one of them to pay a certain amount of the premiums but it didn't work out, and I got them up there and told them if I had to provide for her I felt my wife should be made the beneficiary and they all agreed. From that time on we have been paying the premiums on the policy and taking care of Mrs. Gaeckler and haven't had a bit of help from any one.

"Q. Before that arrangement was made, what had you done toward taking care of her? A. Sir?

"Q. Before the arrangement was made by which your wife was made beneficiary, what had you done in the way of supporting Mrs. Gaeckler then? A. There was about two years before this arrangement was made I paid the premiums on the policy.

"Q. Had you paid any bills or things up to that time? About this policy, before your wife was made beneficiary in the policy had you paid any bills or anything for your mother-in-law? A. Absolutely. She was sick for about eight months there and I took care of her for that time prior to the time we had the arrangement on this policy.

"Q. For the benefit of the record here tell us about what that expense amounted to? A. Oh, God, I don't know what that amounted to. At that time I was working about three hours a day and was buying a home out here and had my father living with us and had to take care of him and I lost the home and I just couldn't keep going, that is all.

"Q. How long was Mrs. Gaeckler ill before that? A. From six to eight months, I think.

"Q. What is the condition of her health now? A. Very poor according to all the doctors we have had.

"Q. Has she any money to pay the doctor? A. She hasn't a thing, No, Sir.

"Q. Does she owe any bills for medicine? A. No, I have been trying to pay the bills so we could get more medicine to take care of her, leaving my bills go to help her.

"Q. Can you give us some idea, for the record, what your bills amount to? A. Yes. You mean the bills I know of.

"Q. What you owe now? A. Between five and eight hundred dollars and going in the hole all time.

"Q. What do you owe it for? A. Because I can't make enough to keep things going.

"Q. Can you give us a record of some of the bills—who they are? A. Is that necessary.

"Q. We want to get it in the record? A. Well, I owe a bill at Mayoes.

"Q. What does that amount to? A. I think its $55.00.

"Q. That is for treatment for yourself, is it? A. Yes.

"Q. When were you there? A. About three years ago, I think. I was on the verge of a nervous breakdown and had to cut out some of the work I was doing.

"Q. Go ahead? A. We have bills at Townsend-Wyatts and practically every place in town, I guess. I don't know exactly what the amounts are.

"Q. State whether or not you feel able to continue to support your mother-in-law?

"Mr. Graves: Just a minute. I object.

"Mr. Duvall: I'll put it this way.

"Q. Are you willing to voluntarily support her further?

"Mr. Graves: Object to that question. It's irrelevant and immaterial to the case.

"Mr. Crowe: We'll let him answer it for what it's worth.

"The Witness: A. No, its impossible for me to do so.

"Q. I think that is all."

On cross-examination of Mr. Kellermeyer, the following appears:

"Q. What is your employment now, Mr. Kellermeyer? A. I am at the Union Depot.

"Q. Are you regularly employed? A. I am now but you don't know from one day to the next how long you are going to be.

"Q. How long have you been regularly employed? A. About two years this last time.

"Q. What is your monthly salary now? A. It's right around $100.00.

"Q. Prior to two years ago how long were you not employed regularly? A. I will say about six or seven years.

"Q. Do you have any other income aside from your salary, in the home? A. No.

"Q. Since you have been regularly employed your financial situation is better than it was, say three years ago, is it not? A. I have been trying to pay up the bills I incurred during the time I was unemployed.

"Q. You live in a home where you work out the rent? A. That is right, but the doctors have told me I have to cut it out.

"Q. How long have you had this arrangement for your home? A. A little over a year.

"Q. The bills you are talking about owing are bills of long standing that were made several years ago, is that correct? A. Yes, sir.

"Q. From your earnings, you are able to meet your current expenses, are you not? A. Yes and no. We do try to keep them up but we don't make the grade.

"Q. With the exception of your back debts, you are able to keep your current bills up, are you not? A. No. We are making bills every day.

"Q. You pay those at end of the month, do you not? A. We try to, but we don't succeed.

"Q. But at the present time you and your wife are furnishing Mrs. Gaeckler a home—A. And everything she requires.

"Q. And you have been doing that the past twelve years or thirteen years? A. And in that time I had my mother with me for a time and my father for a time. I had my father with me until he died, and I paid everything for him.

"Q. How long has he been dead? A. He has been dead three years now. I had a home I was attempting to buy. I lost that because I had all the added expenses and I couldn't keep up the payments.

"Q. At the time your wife was made beneficiary of the insurance policy, was there an understanding between you and your wife and Mrs. Gaeckler for the changing of the beneficiary, she would live there and you would take care of her? A. No.

"Q. What was the understanding? A. The understanding was if I was to make the payments on the policy my wife was to be the beneficiary.

"Q. Was there anything said about where Mrs. Gaeckler was to live and who was to take care of her? Wasn't that discussed? A. Not at that time, no. She had been there about two years prior to that time and that was understood, I presume, she was to stay with us. We have paid into that policy about as much as the cash surrender value is worth. What is going to happen to us if she passes away. You know as well as I do, by the time that happens a person has contracted a lot of debts and probably a hospital bill. The insurance policy, it seems, is a big factor in keeping her from getting a pension. It is my contention   .  .  ."

On redirect examination, the following appears:

"Q. I will ask you this—did you take into consideration when your wife was made the beneficiary what you had already paid and done for your mother-in-law? A. Yes, we did. And we also considered because of the fact she had been in very poor health, we considered the fact of her sickness and at her decease, that we would in some way be protected in laying her away because we knew absolutely there was no help forthcoming from anywhere else."

The question as to whether or not the commission erred in applying the law to the undisputed facts was clearly involved in the review in the circuit court and is clearly involved in our review herein.

The fundamental principles involved are so clearly and ably set forth in the Supreme Court's opinion in the Howlett v. Social Security case, 149 S. W. (2d) 810, that we quote:

"The question is somewhat different when the contention is made that the commission erred in applying the law to conceded or undisputed facts, or to facts as specifically found by them. A given proposition either is the law or it is not. There is no middle ground. Granted that certain facts are admitted to exist or are found to exist by the commission upon the record evidence, then the commission, in deciding that upon those facts, the applicant is or is not entitled to assistance, either applies and follows the correct principle of law or it does not. If it does not follow the law its decision is clearly arbitrary and unreasonable. It is true that reasonable men may and sometimes do differ as to what the law is. But, under our system of government, the final word upon this question must be spoken by the courts.

"It cannot be said that the courts, in setting aside an executive-administrative determination because it is opposed to law, invade the sphere of government assigned by the constitution to the executive department. For the final determination of questions of law and the final interpretation of the meaning of statutes is a part of that judicial function vested by the constitution in the courts. For this reason the commission should carefully distinguish between their findings of fact and their conclusions of law, that the courts may, while paying due deference to administrative fact-finding, be free to correct errors in legal interpretation."

The Dunnivant case, *supra*, is a borderline case; every feature of the case is in the shadow of the twilight zone.

Our courts have classified the relief provided for in the Social Security Act as a gratuity. When a gratuity is safeguarded by conditions and restrictions, these legal conditions and restrictions must be followed by our courts to the end that the beneficence of the gratuity be not destroyed.

In the Dunnavant case, this court said:

"As it has been in the past, so it is in the present, good and wholesome laws in order to be maintained for the public good, must have restrictions on administration that guard against the wiles of the unworthy which may result in wrong to the worthy."

In the above case the applicant was shown to be an old lady advanced in years whose worldly goods consisted of a life insurance policy valued at a cash surrender of $700. The applicant had resided with her daughter and had been reasonably supplied with the necessities of life. The mother had been the owner of the home in which she and her daughter lived. This home had been deeded to the daughter who thereafter had, at her own expense, remodeled same and thereby made it a good home, valued so that the residence and the household goods had been insured for $3500. The evidence in the Dunnavant case further disclosed that the house was deeded to prevent other children who were not contributing to the support from

sharing in same. The record in the Dunnavant case shows that the supporting daughter was put to many hardships and deprivations in caring for her eighty-three-year-old helpless mother. There are facts disclosed in the above case from which inference can be drawn that the greater part of the cost of the home had been contributed. by the daughter and under the law as it stood prior to 1937, the mother was clearly a worthy applicant.

Under the facts of the Dunnavant case this court held as follows:

"There is also evidence to the effect that the daughter, confronted with conditions that made it a talk to keep the wolf from the door, has been faithful to every moral obligation of a child to a parent and has in the past and is at the present giving such subsistence and care to her aged mother as presents substantial evidence that will sustain the finding: 'Sufficient to meet needs for a reasonable subsistence compatible with decency and health.' "

We conclude that there are facts shown in the case at bar that distinguishes it from the Dunnavant case. This case is distinguished by the fact that both the daughter and her husband herein positively state that they refuse to further voluntarily support the applicant. As these parties, at the date of the hearing, were to the best of their ability supporting the applicant, the above testimony would not be alone conclusive of the real issue of this case. However, the explanations given by the husband of the daughter are pertinent to a conclusion that presents a premise to conclusion. In reply to the question of his willingness to support, the reply is, "No, it is *impossible* for me to do so." (Italics ours.)

The real issue in this case is the answer to the question contained in subsection (6), Section 9406, Revised Statutes, Missouri, 1939, as follows:

"(6) has earning capacity, income, or resources, whether such income or resources is received from some other person or persons, gifts or otherwise, sufficient to meet his needs for a reasonable subsistence compatible with decency and health."

The applicant, old, feeble and sick, admits that her daughter and her husband have been supporting her "to the best ability, I expect, Yes, Sir." The question arises as to whether supplying to the best of their ability is "sufficient to meet her needs for a reasonable subsistence compatible with decency and health."

We conclude that the evidence in this case is clearly to the effect that the aged and sick applicant is clearly in need of medical attention compatible with decency and health, that she is not now receiving and has not been receiving. We further conclude that the undisputed evidence shows that misfortunes now confronting and that have confronted applicant's daughter and her husband have prevented and, at time of hearing, rendered them financially incapable to support and care for the applicant compatible with decency and health.

As was well said in the opinion in the Howlett case, *supra,* "the final determination of questions of law and the final interpretation of the meaning of statutes is a part of that judicial function vested by the constitution in the courts."

In the aforesaid opinion, it is further stated: "But if the ultimate decision of the commission is not based upon substantial evidence, the finding must be characterized as arbitrary and unreasonable and the determination reversed."

Based upon the undisputed evidence in this case and upon the law as declared by the Supreme Court in the Howlett case, *supra,* we conclude that no error was committed by the circuit court in reaching conclusions stated in its judgment and its order remanding.

Judgment affirmed. All concur.